J-A09033-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                             :        PENNSYLVANIA
                             :
        v.                   :
                             :
                             :
ANDRE LAMONT JOHNSON         :
                             :
        Appellant            :  No. 781 WDA 2025

Appeal from the Judgment of Sentence Entered May 27, 2025
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0002403-2023

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:              **FILED:  July 23, 2026**

Andre Lamont Johnson ("Johnson") appeals from the judgment of sentence imposed following his convictions for terroristic threats and evading arrest or detention on foot.[1]  Johnson challenges only the sufficiency of the evidence supporting his terroristic threats conviction.  After careful review, we conclude Johnson's sufficiency claims merit no relief, and, consequently, we affirm.

The relevant facts, as gleaned from the trial testimony, are as follows. In February 2023, Johnson's wife, Isha Staples ("Staples"), lived with her two

---

[1] **See** 18 Pa.C.S.A. §§ 2706(a)(1), 5104.2.  Johnson was charged with several offenses in connection with the events discussed **infra**.  Johnson was acquitted of some of the other charges, the Commonwealth withdrew some, and Johnson was convicted for harassment.  These other offenses are not germane to the present appeal.

children in a residence her mother owned. **See** N.T., 2/25-26/25, at 51-52, 59. Johnson stored belongings there, but stayed over only periodically. **See id**. at 52-53.

On February 24, 2023, Staples spoke with Johnson by telephone while she was driving to work. **See id** at 54. Concerned by the conversation, Staples drove to Johnson's school, where she arrived before Johnson. **See id**. At approximately 2:50 or 2:55 p.m., Johnson arrived in a vehicle with another woman. **See id**. Staples confronted Johnson and the woman, and a verbal altercation followed. **See id**. at 56. A little after 3:00 p.m., Staples returned home, packed Johnson's belongings into her car, and then went to work. **See id**. Staples finished work at 7:00 p.m. **See id**. at 55-56. At approximately 7:20 p.m., Johnson called Staples and asked about his belongings, and Staples agreed to meet at a local gas station to give them to him. **See id**. at 57, 112.

At approximately 7:54 p.m., Staples's daughter, D.D., was alone in her bedroom when she heard noises coming from an adjacent closet, which she recognized as the sound of a window opening. **See id**. at 13, 122, 153. D.D. testified that it was commonly known, including to Johnson, that she was "always home by myself." **Id**. at 48. D.D. had the television on at the time. **See id**. at 15. While the light was not on in her room, the hallway light was on. **See id**. at 47-48. D.D. could not initially see Johnson but she recognized his voice and heard him scream, "[O]h this bitch can't get rid of me; I'll kill

everyone in here. Everyone can die; I'll kill everyone; this is my house." *Id*. at 15-16, 47-48. D.D. then saw Johnson enter the residence, after which she locked herself inside her bedroom and texted her brother. *See id*. at 18, 32, 48. D.D. testified she was scared for her life, and her brother told her to call the police. *See id*.[2]

Sergeant Christopher Mourdant ("Sergeant Mourdant") of the West Mifflin Borough Police Department responded to the call. *See id*. at 129-30. D.D. ran towards the police vehicle, visibly shaken and distraught as she described what had happened. *See id*. at 133. Staples arrived and informed Sergeant Mourdant that Johnson had a key but did not have permission to be at the house because they were divorcing. *See id*. at 142. Sergeant Mourdant observed damage to the rear door and the blinds covering the closet window. *See id*. at 146, 150.

Johnson later arrived at the scene and did not comply with police commands to place his hands on a vehicle. *See id* at 157, 159-160. Instead, he ran toward the house, and police tased him. *See id*. Officers arrested Johnson. The Commonwealth charged him with various offenses arising from this incident, and Johnson elected a non-jury trial at which D.D. and Staples, among others, testified.

---

[2] Staples got a call from her son, D.D.'s brother, saying that Johnson was inside of their home and had entered through a window. *See* N.T., 2/25-26/25, at 58. Staples told her son to call the police and drove home. *See id*.

At trial, Johnson testified in his own defense. He testified he was married to Staples and had lived in the residence for eight years. *See id*. at 194-95. He explained he went there because he believed Staples would not be home and wanted to gather his things without seeing her. *See id*. at 196. He testified that his key for the house did not work that day, so he entered through a window. *See id*. He stated he did not recall making any threats and did not know anyone was home. *See id*. at 197-98. He denied damaging the door and testified that Staples's son had caused the rear-door damage. *See id*. at 199.

At the conclusion of the trial, the court found Johnson guilty of terroristic threats and evading arrest. *See id*. at 243-244. The court subsequently sentenced Johnson to an aggregate term of six to twenty-three months of incarceration and two years of probation. *See* Sentencing Order, 5/27/25, at 1-2 (unnumbered). Johnson filed a timely notice of appeal, and both Johnson and the trial court complied with Pa.R.A.P. 1925.

Johnson raises the following issues for our review:

1. Whether there was sufficient evidence to prove terroristic threats when the Commonwealth failed to prove [Johnson] communicated a threat to the victim?

2. Whether there was sufficient evidence to prove terroristic threats when the Commonwealth failed to prove [Johnson] had the intent to terrorize the victim?

Johnson's Brief at 8.

Both of Johnson's claims challenge the sufficiency of the evidence supporting his terroristic threats conviction; accordingly, we address them together. Our standard of review for sufficiency claims is well settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt . . .. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Stahl*, 175 A.3d 301, 303-04 (Pa. Super. 2017) (emphasis removed). On sufficiency review, evidence is viewed in the light most favorable to the Commonwealth as verdict winner, not the defendant. *See, e.g.*, *Commonwealth v. Brunson*, 347 A.3d 808, 820 (Pa. Super. 2025); *Commonwealth v. Risoldi*, 238 A.3d 434, 454 (Pa. Super. 2020). In reviewing a sufficiency claim, this Court has also acknowledged that:

we may not weigh the evidence and substitute our judgment for the fact-[ ]finder . . . . The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Burton*, 234 A.3d 824, 829 (Pa. Super. 2020) (citation omitted); *see also Commonwealth v. Fitzpatrick*, 181 A.3d 368, 374 (Pa. Super. 2018) (stating all evidence is considered in conducting sufficiency review).

A person commits the crime of terroristic threats if he "communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1). The intent to terrorize may be inferred from the totality of the circumstances. *See Commonwealth v. Crosby*, 226 A.3d 104, 107 (Pa. Super. 2020).

"[T]he harm sought to be prevented by the [terroristic threats] statute is the psychological distress that follows from an invasion of another's sense of personal security." *Commonwealth v. Kline*, 201 A.3d 1288, 1290 (Pa. Super. 2019) (citation omitted). Although Section 2706 does not penalize "mere spur-of the-moment threats which result from anger," courts must evaluate the alleged threat in light of all the surrounding circumstances. *Commonwealth v. Demulter*, 314 A.3d 934, 937-38 (Pa. Super. 2024). Anger, standing alone, does not render a defendant incapable of forming the intent to terrorize. *See id*. at 938.

Johnson first argues the Commonwealth failed to prove he communicated a threat to the victim. *See* Johnson's Brief at 19-24. Johnson alleges the threat was not directed at anyone in particular because he did not know D.D was home. *See id.* at 22. Further, his threat was made in a moment of anger, which is not the conduct the terroristic threats statute meant to criminalize. *See id*. Johnson contends that, if his behavior constitutes terroristic threats, then Staples and her son should have been considered victims too. *See id*. at 24.

The trial court found D.D.'s testimony credible and concluded that the Commonwealth's evidence "certainly permitted the fact finder to conclude that [Johnson] was aware one or more of [Staples's] children were home at the time he entered." Trial Court Opinion, 10/21/25, at 11-12. The court further found it improbable that Johnson would scream threats to kill everyone inside if he believed the residence was unoccupied. *See id*.

Following our review, we conclude the evidence, viewed in the light most favorable to the Commonwealth as the verdict-winner, supports the trial court's conclusion that the testimony established Johnson knew D.D. was home and communicated a threat to kill everyone—which includes D.D.—in the residence. D.D. testified, and it was uncontested, that it was common knowledge among the people living in the housing that she was always home. *See* N.T., 2/25-26/25, at 48. Further, Johnson entered the residence through a window near D.D.'s bedroom, and D.D. testified that the lights and television were on when Johnson entered. *See id*. at 15, 47-48; Trial Court Opinion, 10/21/25, at 11. D.D. was present in the residence and personally heard Johnson threaten to kill everyone inside. *See* N.T., 2/25-26/25, at 15, 47-48. Accordingly, the Commonwealth presented sufficient evidence that Johnson communicated a threat to D.D.

Johnson next argues that the Commonwealth failed to establish that he acted with the intent to terrorize. *See* Johnson's Brief at 25-29. Johnson maintains that he made the statements out of anger, outside the presence of

any victim, and without the means to carry out the threat. *See id*. He further argues that he entered through the window merely to avoid confrontation and retrieve his belongings. *See id*. at 29.

The trial court concluded that the totality of the circumstances proved Johnson intended for whoever was in the residence to hear his threats because it strained credulity to believe he would yell threats into a house that he believed was unoccupied. The court reasoned that Johnson intended to make his presence "known in such a way that he would not be approached" as he gathered his belongings. Trial Court Opinion, 10/21/25, at 13.

Following our review, we conclude the record supports the trial court's reasoning. Johnson's threat was not made during the earlier verbal altercation with Staples. Rather, hours later, Johnson entered the residence through a closet window and screamed that he would kill everyone inside the house. *See* N.T., 2/25-26/25, at 15, 47-48. Additionally, it was known that D.D. was often at home, alone, and at the time Johnson entered, D.D. was watching television and the hallway light was on, which demonstrated that Johnson knew the residence was occupied. *See id*. The fact that Johnson screamed threats into a house that was demonstrably occupied shows his intent to communicate the threat to whomever was inside.[3]

---

[3] In **Demulter**, this Court concluded that a threat was not a spur-of-the-moment expression of transitory anger where it was not precipitated by a heated exchange and the surrounding circumstance supported the defendant's
*(Footnote Continued Next Page)*

Thus, viewing the evidence in the light most favorable to the Commonwealth, the evidence was sufficient to establish that Johnson communicated a threat to commit a crime of violence with the intent to terrorize D.D. Therefore, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/23/2026

_____

intent to terrorize. **See Demulter**, 314 A.3d at 937-38. Likewise, Johnson's threat occurred after the earlier confrontation with Staples had ended, and not during a heated exchange with D.D. The trial court could reasonably infer that Johnson's entry through a window and his declaration that "everyone" inside would die were intended to terrorize the occupant of the residence. **See** N.T. 2/25-26/25, at 15, 47-48.

Additionally, neither Johnson's ability to carry out the threat nor D.D.'s belief that he would actually carry out the threat was relevant. **See Commonwealth v. Reynolds**, 835 A.2d 720, 730 (Pa. Super. 2003). Further, Johnson's reliance on **Commonwealth v. Kidd**, 442 A.2d 826 (Pa. Super. 1982), is unavailing. In **Kidd**, this Court reversed a terroristic threats conviction where the defendant made the statements while intoxicated, agitated, and angry. **See id**. at 827. Here, there was no evidence that Johnson was intoxicated, and hours had passed between his confrontation with Staples and his entry into the residence. **See** N.T., 2/25-26/25, at 54-57, 112, 196.